**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-1599

———————

LUIS ANTONIO DUTTON MYRIE,
Petitioner

v.

THE ATTORNEY GENERAL
UNITED STATES OF AMERICA,
Respondent

———————

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge:  Honorable Walter A. Durling
(No. A070-851-548)

———————

Argued November 16, 2016

Before: AMBRO, CHAGARES,
and FUENTES, <u>Circuit Judges</u>

(Opinion filed:  April 28, 2017)

Nathanael P. Kibler          (Argued)
Baker Donelson Bearman Caldwell & Berkowitz
265 Brookview Centre Way, Suite 600
Knoxville, TN 37828

    *Counsel for Petitioner*

Benjamin C. Mizer
   Principal Deputy Assistant Attorney General
   Civil Division
Bernard A. Joseph
   Senior Litigation Counsel
Jason Wisecup
Erica B. Miles          (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

    *Counsel for Respondent*

————————————

OPINION OF THE COURT

————————————

AMBRO, <u>Circuit Judge</u>

Petitioner Luis Antonio Dutton-Myrie petitions for review of a ruling by the Board of Immigration Appeals ("BIA" or "Board") dismissing his appeal of the decision by an Immigration Judge ("IJ") that he is ineligible for deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment. S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 ("CAT"). Dutton-Myrie contends that the Board erred in affirming the IJ's conclusion that the government of Panama would not be willfully blind to torturous acts against him and, in any event, stated incorrectly what constitutes acquiescence to torture by Panamanian officials. He also asserts that the IJ is biased against him and this, among other things, violated his due process rights.

We conclude that the BIA did not apply the correct legal standard under the CAT and should have reviewed the IJ's application of this standard *de novo*. We remand on these grounds. While we reserve judgment on Dutton-Myrie's due process claim, we express concern that the IJ's opinion suggests such frustration with this case (which appears to have nine lives) that the Board should consider assigning it to a new IJ if further fact-finding is necessary.

## I. Facts and Procedural History

### a. Dutton-Myrie's background

Dutton-Myrie is a native and citizen of Panama who came to the United States on a visitor's visa in 1991 and remained after his visa expired six months later. In the early 1990s he pled guilty to cocaine-related offenses and criminal attempt to commit escape.

In 1998 the former Immigration and Naturalization Service charged Dutton-Myrie as removable for overstaying his visa and as an alien convicted of an aggravated felony for trafficking in a controlled substance. An IJ sustained the charges against him and ordered him removed to Panama. Government agents began the process of deporting Dutton-Myrie, but he de-boarded the plane undetected before it left

3

the United States and continued to live in this country without legal status.

The Government apprehended Dutton-Myrie in 2005 and deported him to Panama. A few days after he returned, the record indicates that a group of men came to his ex-girlfriend's apartment and stabbed him in the neck. He fled the country and re-entered the United States through its southern border.

The Government apprehended Dutton-Myrie a second time in 2007 and charged him with illegal re-entry. He ultimately pled guilty to these charges and was sentenced to time served.[1] The Government then transferred him to the custody of Immigration and Customs Enforcement ("ICE").

> b. Removal proceedings before the Immigration Judge

The United States Department of Homeland Security reinstated in 2012 the final order of removal against Dutton-Myrie. However, an asylum officer found he expressed a reasonable fear of returning to Panama and referred him to an IJ. Dutton-Myrie filed an application for deferral of removal under the CAT based on his claim that members of the Mara Salvatrucha ("MS-13") gang would likely torture him if he returned to Panama.

Dutton-Myrie represented himself at the hearing on his application. He testified that his uncle, Reginaldo, and his brother, Ricardo, started a gang called La Banda del Norte in the 1980s in his hometown of Colón, Panama. Over time the

---

[1] He was also sentenced to two years of supervised release in the event that he was not immediately deported to Panama.

4

gang spread beyond Colón, entering into feuds with rival gangs, including the MS-13. Dutton-Myrie claimed that members of the Panamanian MS-13 were responsible for beating Reginaldo to death in Brooklyn, New York, in 1992, and for murdering Ricardo in Panama four years later.

According to Dutton-Myrie, the MS-13 targeted male family members living in Panama because of their kinship ties to Reginaldo and Ricardo: in 1995, Dutton-Myrie's brother Jose was drowned; his brother Nelson was beaten and stabbed in 1997; his brother Arnaldo was shot in 2001, was attacked again in 2004, and died in 2009 after members of the MS-13 shot him 21 times; and in 2010 his brother Regelio was shot twice but survived.

Dutton-Myrie further testified that gang members attacked him immediately after he arrived in Panama in 2005. A former girlfriend in Panama submitted an affidavit attesting that she called the police to report the attack, but no officer came to investigate. Dutton-Myrie then fled the country. He stated that he believed the police were either bribed by the MS-13 or were unwilling to protect his family, and he supported this conclusion with record evidence of his brothers' deaths and testimonial evidence that the investigations into the murders and violent attacks remained unresolved. Dutton-Myrie also submitted a letter from the Panamanian Department of Public Safety confirming the deaths of his family members, stating that his surviving family members receive death threats, and referencing a complaint that his mother made reporting threats to her children's lives.

The IJ found Dutton-Myrie to be credible, accepting as true his testimony that the gang had killed several of his family members and that police had not prosecuted anyone for these crimes. Though expressing "concerns for [the]

5

safety" of Dutton Myrie if he were removed to Panama, the IJ nonetheless determined that he failed to establish that Panamanian officials would consent or acquiesce to the harm he feared and thus denied his CAT claim.

### c. The BIA's first ruling

Dutton-Myrie appealed the IJ's conclusion that he was not eligible for CAT relief. The BIA affirmed, holding that "[t]he evidence d[id] not establish that the Panamanian government acquiesces to torture by gangs, as the term has been interpreted by the Third Circuit, but rather shows that it has been actively trying to combat them."

### d. The Government requests remand

Dutton-Myrie petitioned our Court for review. The Attorney General filed a motion to remand to "allow the Board to reconsider and/or clarify the bases for its . . . decision in light of *Pieschacon-Villegas v. Att'y Gen. of the U.S.*, 671 F.3d 303, 311-14 (3d Cir. 2011)." We granted this motion and remanded the case to the BIA, whereupon it vacated its first decision and remanded to the IJ.

### e. The Immigration Judge's second decision and the BIA's second ruling

The IJ issued a second ruling in 2013. He again denied CAT relief. Though the IJ found that Dutton-Myrie's "credibility [was] not at issue," CAT protection remained unavailable because he determined Dutton-Myrie had not established that the Panamanian government "permit[ted] a certain level of gang violence in order to inflict severe pain or suffering on him." On appeal, Dutton-Myrie argued the IJ applied an erroneous legal standard for acquiescence by requiring him to show the Panamanian government intended

6

that he be tortured.

The Board sustained the appeal. It agreed that the specific intent requirement applies only to those who commit acts of torture, whereas an applicant need only show willful blindness to establish acquiescence to the torture by others. It also noted that the IJ failed to consider evidence relevant to the likelihood of future harm. The Board therefore found it "necessary to again remand [for the IJ] to reassess whether [Dutton-Myrie] established acquiescence" despite the Panamanian government's opposition to the MS-13, as well as "evidence of future torture."

### f. The IJ's third decision and the Board's remand

The IJ denied relief a third time in 2014. There he relied on independent research he put into evidence, including a 2011 Panama Crime and Safety Report and an article from *Panama Digest*, which he found suggested the MS-13 gang was a "recent phenomenon" in Panama. The IJ further deviated from his prior two findings of credibility, stating instead that the evidence cast "serious doubt on the veracity of [Dutton-Myrie]'s claim that MS-13 lay behind the devastation to his family." The IJ discounted the letter from the Department of Public Safety in Panama as unverified. He then concluded without discussion that the evidence was insufficient to establish willful blindness.

Dutton-Myrie appealed, and once again the Board ordered a remand to the IJ for further proceedings. It held that he erred in (1) questioning Dutton-Myrie's credibility despite finding him credible in prior proceedings, (2) failing to notify Dutton-Myrie that further corroboration was required, and (3) relying on an internet search that was not part of the record of proceedings. The Board directed the IJ on remand "again [to] determine whether [Dutton-Myrie]

7

established acquiescence, as well as evidence of the likelihood of future torture."

###### g. The IJ's fourth decision and the Board's affirmance

On remand, the IJ requested that both parties respond to the country conditions evidence the IJ introduced previously. The record contains notice of a hearing, yet the BIA cannot locate a transcript of the hearing and the Government now contests Dutton-Myrie's claim that it occurred. In his fourth decision, the IJ concluded that there was no rebuttal of the evidence suggesting that the MS-13 had only recently begun to infiltrate Panama and opined that he was "wholly unconvinced" that the group had attacked Dutton-Myrie and his brothers. Yet the IJ specifically stepped back from any adverse credibility determination as the legal basis for his decision. Instead, he relied on his conclusion that Dutton-Myrie could not establish the Panamanian government would acquiesce to the harm he alleged and cited the absence of corroborating evidence that the MS-13 was responsible for the deaths of Dutton-Myrie's family members or that it was operating in Panama when the attacks occurred. The IJ also found that Panama was actively combating gangs and that Dutton-Myrie could not establish that it was unwilling or unable to protect him because he had not reported the 2005 attack to the police and presented no further evidence that a public official was "willing to do him harm or [to] acquiesce in someone else doing him harm."

Once again, Dutton-Myrie appealed the IJ's decision, and here the BIA dismissed the appeal. It discerned no clear error in the IJ's finding that the Panamanian government fell short of acquiescing to torture. The Board supported this conclusion by citing to the IJ's findings that (1) "Panama 'actively engage[s]' against criminal gangs and combats

8

crime," and (2) "although the applicant was attacked in February 2005, he never reported the incident to police." The BIA also rejected Dutton-Myrie's due process claims, finding insufficient evidence that the IJ harbored personal bias against Dutton-Myrie or that the IJ failed to consider relevant evidence. While the Board recognized that "the [IJ] did not specifically reference a letter from the Department of Public Safety in Panama [confirming his family members' deaths, stating that his surviving family members continue to receive death threats, and referencing his mother's complaint reporting threats to her children's lives]," the Board concluded that "this [was] insufficient to establish that the [IJ] did not consider this evidence." Another petition for review followed.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review a final order of the BIA denying CAT relief. However, because Dutton-Myrie is subject to removal based on an aggravated-felony conviction, the statute constrains our jurisdiction to "constitutional claims or questions of law," as "factual or discretionary determinations are outside of our scope of review." *Pierre v. Att'y Gen.,* 528 F.3d 180, 184 (3d Cir. 2008) (en banc) (referring to the provisions of 8 U.S.C. § 1252(a)(2)(C)-(D)).

Constitutional claims or questions of law we review *de novo*. *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 63 (3d Cir. 2007). Where the BIA affirms and partially reiterates the IJ's discussions and determinations, we look to both decisions. *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d Cir. 2009). If the Board relies only on some of the grounds given for denying relief, we review only these grounds. *Chukwu v. Att'y Gen.*, 484 F.3d 185, 193 (3d Cir. 2007).

### III. Analysis

#### a. The Convention Against Torture

Article 3 of the CAT provides that "[n]o State Party shall expel, return . . . or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." "The burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "For an act to constitute torture under the [CAT] and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." *Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005) (citing *Matter of J–E–,* 23 I. & N. Dec. 291, 297 (BIA 2002)). "If an alien produces sufficient evidence to satisfy that burden, withholding of removal or deferring of removal [under the CAT] is mandatory." *Silva–Rengifo,* 473 F.3d at 64 (citing 8 C.F.R. §§ 1208.16–18).

To establish acquiescence, an applicant must demonstrate that, prior to the activity constituting torture, a public official was aware of it and thereafter breached the legal responsibility to intervene and prevent it. 8 C.F.R. § 1208.18(a)(7). The applicant can meet this standard even where the government does not have actual knowledge of the torturous activity if he "produc[es] sufficient evidence that the government [] is willfully blind to such activities." *Silva–Rengifo,* 473 F.3d at 65; *see also Gomez–Zuluaga v. Att'y Gen.,* 527 F.3d 330, 350 (3d Cir. 2008) (quoting *Silva–Rengifo,* 473 F.3d at 65). "[A]ll evidence relevant to the

10

possibility of future torture shall be considered." 8 C.F.R. § 1206.16(c)(3); *see Pieschacon-Villegas*, 671 F.3d at 310. Circumstantial evidence may establish acquiescence to targeted acts of violence even when the government has an official policy or is engaged in a campaign of opposition against the entity the applicant fears. *See id.* at 312; *Gomez-Zuluaga*, 527 F.3d at 351.

> b. The BIA applied the incorrect standard of review to the IJ's determination that Dutton-Myrie could not establish government acquiescence to the torture he fears.

Dutton-Myrie argues that the BIA erred in reviewing for clear error the IJ's conclusion that the Panamanian government would not acquiesce to torture. True enough, the Code of Federal Regulations directs the Board to review the IJ's findings of fact for clear error, 8 C.F.R. § 1003.1 (d)(3)(i), but its authority to review questions of law, discretion, and judgment is *de novo*, *id.* at § 1003.1(d)(3)(ii); *see also In re Cabrera*, 241 I. & N. Dec. 459, 460 (BIA 2008) (interpreting the regulation as providing *de novo* review of questions of law or mixed questions of law and fact). We agree with Dutton-Myrie that the question of whether likely government conduct equates to acquiescence is a mixed question of law and fact under our decision in *Kaplun v. Att'y Gen.*, 602 F.3d 260 (3d. Cir. 2010). What this means is that the Board should review without deference the ultimate conclusion that the findings of fact do not meet the legal standard.

To determine whether an applicant has met the burden of establishing that it is more likely than not he would be tortured if removed, the IJ must address two questions: "(1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of

11

torture?" *Id.* at 271. In the first part of the inquiry, the IJ reviews the evidence and determines future events more likely than not to occur. These findings are "made up of facts" and are "distin[ct] from [their] legal effect." *Id.* at 269 (citing Black's Law Dictionary 669 (9th ed. 2009)). Accordingly, the Board reviews these factual findings for clear error. *Id.* at 269-71. The IJ then determines whether the likely harm qualifies as torture under the governing regulations, and the Board reviews this legal conclusion *de novo*. *Id.* at 271.

In assessing whether an applicant has established that public officials will acquiesce to the feared tortuous acts of a non-state actor, the IJ also must conduct a two-part analysis. First, the IJ makes a factual finding or findings as to how public officials will likely act in response to the harm the petitioner fears. Next, the IJ assesses whether the likely response from public officials qualifies as acquiescence under the governing regulations. As above with respect to determinations of torture, this second part of the inquiry is a legal question. While the Board reviews the first part for clear error, it must review the second *de novo*.

To the extent a *dictum* in *Kaplun* suggested that whether the government would acquiesce was a factual question, *id.* at 272, it addressed only the first component of the inquiry into acquiescence: how the government would likely act in response to the harm the applicant fears. We clarify that the IJ must then apply the legal standard for acquiescence to determine whether this response establishes that a public official was "aware[] of [the torturous] activity" and subsequently breaches his or her "legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). In colloquial terms, the question might be: Is the official willfully blind?

The Board stated that it found "no clear error in the Immigration Judge's finding that the government of Panama would not be acquiescent to any torture." While the Board was correct in reviewing for clear error the IJ's factual findings (that the government actively engages against criminal gangs and that Dutton-Myrie did not provide the police notice that the gang attacked him in the past), it should have determined *de novo* whether these findings were sufficient to establish acquiescence.

Although it is possible that the BIA considered the appropriate willful blindness standard before concluding that the IJ's factual findings on likely government conduct would not qualify as acquiescence to torture as a matter of law, we cannot tell from the BIA's short decision whether this is indeed the case. "In order for us to be able to give meaningful review to the BIA's decision, we must have some insight into its reasoning." *Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir. 2003). In any subsequent opinions in this case, the BIA should endeavor to explain clearly which conclusions of the IJ it is reviewing and which standard it is applying in so doing.

While we recognize this error may have resulted from a miscommunication on our part, the Board's decision illustrates why we must remand. Because the Board did not conduct the second step of this two-part analysis, we have little insight into the basis for its determination that the IJ's opinion "clearly reflects that he used the proper 'willful blindness' standard in relation to the issue of acquiescence." In support of its conclusion, the Board provides only a citation to a portion of the IJ's opinion where he neither defines willful blindness nor indicates why Dutton-Myrie's evidence of willful blindness was insufficient to establish acquiescence. While the IJ states that he is incorporating his "prior references to the CAT standards," and that he "already

13

addressed" the holding of *Pieschacon-Villegas* in prior rulings, the Board found that the IJ failed to apply our holdings on acquiescence in *Pieschacon-Villegas* and *Roye v. Att'y Gen.*, 693 F.3d 333 (3d Cir. 2012), in those rulings. Remand in this instance will give the Board an opportunity to provide a reasoned basis for its conclusion as to whether Dutton-Myrie can establish the necessary elements of torture.

> c. On remand, the Board must consider circumstantial evidence of willful blindness.

The regulations require the Agency to consider all evidence relevant to the possibility of future torture. *See* 8 C.F.R. § 1206.16(c)(3); *Pieschacon-Villegas*, 671 F.3d at 315-317. Circumstantial evidence that public officials are willfully blind may establish acquiescence to future torture. Hence the Board must consider it.

Dutton-Myrie submitted circumstantial evidence via live testimony and sworn letters attesting that the Panamanian government had not taken steps to protect him or his family in the past and would likely continue to breach the duty to intervene in the future. In particular, he submitted a letter from the Panamanian Public Safety Department attesting to continued threats to his family members and that his mother lodged grievances about these threats with public officials. For the IJ not to reference this letter, and then for the BIA to intuit that somehow he considered it in concluding against Dutton-Myrie, is simply too speculative an inference to draw.

We also cannot conclude based on the record before us that the Board considered other relevant circumstantial evidence. Dutton-Myrie submitted an affidavit from his former girlfriend in which she stated that she reported the 2005 incident to the police. The Board did not address this evidence, but stated that the IJ's decision clearly reflects that

14

he applied the proper willful blindness standard with a citation to the final page of his opinion where he dismissed Dutton-Myrie's former girlfriend's testimony as "not verified." Why a signed affidavit did not qualify as verified testimonial evidence escapes us. If it is to be disregarded, we need to know why.

Dutton-Myrie also testified about the futility of reporting to the police. In his first decisions, the IJ found this testimony credible and never notified Dutton-Myrie of a subsequent view otherwise. In any event, because this evidence is relevant to determining if the harm he fears will be met with a "blind eye" by authorities, the Board needed to consider it.

We also disagree with the Board's reliance on two factual findings in support its conclusion that the IJ did not err in finding no government acquiescence to torture. It affirmed on the grounds that (1) "the record indicates that the government of Panama 'actively engage[s]' against criminal gangs and combats crime," and (2) "although the applicant was attacked in February, 2005, he never reported the incident to police." However, neither one of these circumstances, either alone or with the other, precludes an applicant from establishing that the government was willfully blind. "[A]n applicant can establish governmental acquiescence even if the government opposes the [] organization that is engaged in torturous acts." *Pieschacon-Villegas*, 671 F.3d at 312. And nowhere do the regulations require actual knowledge of specific torturous acts against the applicant.

When the Board has relied on the failure to report crimes to show the absence of actual knowledge by a government official, along with the government's active opposition to the group the petitioner fears, in concluding a

15

petitioner cannot establish acquiescence, we have nonetheless remanded with instructions to consider circumstantial evidence that may establish willful blindness. *See Gomez-Zuluaga*, 527 F.3d at 351; *Silva-Rengifo*, 473 F.3d at 70; *see also Bhatt v. Att'y Gen.*, 608 F. App'x 93, 98 (3d Cir. 2015). Thus we grant the petition for review and remand for further proceedings consistent with this opinion.

We conclude with a comment on Dutton-Myrie's due process claim that the IJ deprived him of his right to a fair hearing before a neutral arbiter.[2] We do not decide it, but note our impression that this case, as it is becoming the immigration version of Dickens's *Jarndyce and Jarndyce*, may be ripe for reassignment if further fact-finding is necessary.

---

[2] We do not reach Dutton-Myrie's claim that his due process rights were violated by the failure to prepare a record of remand proceedings.