**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2919
_____

JONATHAN AYALA LEIVA,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A215-665-131)
Immigration Judge: Mirlande Tadal
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
August 20, 2021

Before:  GREENAWAY, JR., KRAUSE and BIBAS, Circuit Judges

(Opinion filed: January 7, 2022)
_____

---

OPINION[*]

---

PER CURIAM

Jonathan Ayala Leiva, acting pro se, petitions for review of his final order of removal. We will grant the petition.

I.

Ayala Leiva is a citizen of El Salvador who entered the United States illegally in 2011. In 2019, the Government charged him as removable on that basis. Through counsel, Ayala Leiva conceded the charge but applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). He claimed to fear persecution and torture in El Salvador on the basis of gang violence directed toward him and his family.

Ayala Leiva and his mother, Myrna Leiva, appeared at a hearing before an Immigration Judge ("IJ"). Ayala Leiva testified that, when he was around six or seven years old, he was present when two gang members ("maras") raped his sister, Jessica. See A.R. 115; see also A.R. at 188–89 (Jessica's sworn account of the incident). He knew the men by their nick-names, "Chickee" and "Goata." A.R. 117. Ayala Leiva stated that the maras put a gun to his head and threatened to kill him unless he left the scene.[1]

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The agency found that the gang members held a gun to Ayala Leiva's head during his sister's attack. See IJ Op. at 3 ("The respondent testified that . . . on the same day that his sister was raped, they held a gun to his head and then told the respondent to leave the area.") & BIA Op. at 1 ("The respondent testified that . . . gang members raped his sister and held a gun to the respondent's head."). However, Ayala Leiva, who testified through an

2

Myrna reported the incident to the police, who arrested the men responsible. Neither Ayala Leiva nor Myrna knows whether the men arrested for Jessica's assault were convicted or for how long they were incarcerated. After the arrests, the gang members discovered Myrna's cell phone number and email address and repeatedly threatened to kill her and the children unless she paid them $12,000 for the release of the arrested assailants. The maras also stalked Myrna and the children. Myrna never reported the threats to the police because the maras told her that if she did, they would kill her children. To escape, Myrna moved the family to a friend's house and then to a motel in El Salvador. However, the gang discovered their new locations. Myrna then took the children to Guatemala before fleeing to the United States. Ayala Leiva was nine or ten years old when they entered the United States.

Ayala Leiva fears that, if he is deported, the gang members will seek reprisal against him for the family's reporting of Jessica's rape. He testified that there is no part of El Salvador where the maras do not have an established presence, and that the police do not provide reliable protection to the public. On the basis of this evidence, Ayala Leiva applied for asylum and withholding of removal on account of his membership in various

---

interpreter, stated that the gun was held to his *sister's* head in response to the question whether he was ever "personally attacked" by the maras. A.R. 115. But in his appeal to the Board of Immigration Appeals ("BIA"), Ayala Leiva stated that he had had a gun pointed to *his* head, see A.R. 11 ("The members put a gun to Respondent's head on the same day his sister was raped and told him to leave the scene."), and other record evidence affirms that he was personally held at gunpoint, see, e.g., Psych. Eval., A.R. 203 ("According to Ms. Leiva, at the age of 10, [Jonathan] was with his sister when a gang member pointed a gun at them and sent Jonathan home."). In any event, the record is unambiguous regarding Ayala Leiva's presence at the scene when the maras assaulted Jessica and threatened to kill him.

particular social groups, including "Salvadorians from San Salvador displaced from their homes by the maras." A.R. 175. He also sought protection under the CAT on the ground that gang members would torture him and that the Salvadoran government would acquiesce.

The IJ found Ayala Leiva to be generally credible, and determined that he had sufficiently corroborated his claims, but denied his applications for relief. The IJ concluded that Ayala Leiva had failed to prove that he suffered past persecution or that he likely faces future persecution on account of a particular social group as required for his applications for asylum and withholding. As relevant here, the IJ determined that Ayala Leiva had failed to state a cognizable particular social group or a sufficient nexus between his membership in his proposed social groups and the harm he fears upon removal. The IJ also concluded that Ayala Leiva had failed to prove that he suffered past torture or that he likely faces future torture as required for his claim under the CAT.

Ayala Leiva appealed to the BIA, which affirmed and adopted the IJ's legal determinations and found no clear error in the IJ's factual findings. Ayala Leiva petitioned for review.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a)(1). Because the BIA affirmed and adopted the IJ's opinion, we review both the IJ's and BIA's opinions. See Ordonez-Tevalan v. Att'y Gen. of U.S., 837 F.3d 331, 340–41 (3d Cir. 2016). We review de novo the agency's legal determinations, including its application of law to facts. See Herrera-Reyes v. Att'y Gen. of U.S., 952 F.3d 101, 106 (3d Cir. 2020). We review the agency's findings

4

of fact for substantial evidence. See 8 U.S.C. § 1252(b)(4)(B); Espinosa-Cortez v. Att'y Gen. of U.S., 607 F.3d 101, 106 (3d Cir. 2010).

III.

We will grant Ayala Leiva's petition because (1) the agency's analysis of his asylum and withholding of removal claims should be reevaluated in light of the Attorney General's recent decision in Matter of A-B-, 28 I. & N. Dec. 307 (A.G. 2021), and (2) the agency failed to consider salient evidence in denying Ayala Leiva's CAT claim.

First, the agency denied asylum and withholding because Ayala Leiva failed to state a cognizable particular social group or establish a sufficient nexus between his proposed social groups and the harm he fears upon removal. In addressing both issues, the BIA relied in part on Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018). That decision has since been vacated. In recent guidance, the Attorney General vacated the prior version of A-B- because, among other things, the previous decision "could be read to create a strong presumption against asylum claims based on private conduct," including gang violence, and thus threatened "to create confusion and discourage careful case-by-case adjudication of asylum claims." 28 I. & N. Dec. at 309.

In this case, the BIA expressly relied on the presumption-like language that led the Attorney General to vacate the prior A-B- decision. See BIA Op. at 2 (citing the previous version of A-B- for the propositions that "social groups defined by their vulnerability to private criminal activity likely lack the required particularity" to be cognizable and that "claims by aliens pertaining to . . . gang violence perpetrated by non-governmental actors

5

will not qualify for asylum"). The Government has not acknowledged that reliance or otherwise addressed A-B- in its brief.

While Ayala Leiva's proposed social groups could still be deemed to be non-cognizable or lacking a nexus to his alleged future harm under the new guidance, the agency did not reach any conclusion under the standards now articulated by the Attorney General, thus leaving this Court without a decision under the governing framework. Thus, we will remand for the BIA to reevaluate Ayala Leiva's claims in light of the Attorney General's recent determination. See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").[2]

Second, the agency erred in evaluating Ayala Leiva's CAT claim. When evaluating a CAT claim, there are two prongs that the agency must address. "First, the agency must determine whether an applicant has met the burden of establishing that it is more likely than not [the petitioner] would be tortured if removed. Second, the agency asks whether public officials will acquiesce in the likely treatment." Quinteros v. Att'y Gen. of U.S.,

---

[2] We are also troubled by the BIA's conclusion that Ayala Leiva's "general apprehension of being a victim of gang violence or recruitment does not provide a basis for asylum or withholding of removal." BIA Op. at 3. This assertion mischaracterizes and understates the record evidence. See Chavarria v. Gonzalez, 446 F.3d 508, 517–18 (3d Cir. 2006). Rather than a "general apprehension" of gang violence, Ayala Leiva's fear of returning to El Salvador is based on credible and corroborated evidence of specific past harms to Ayala Leiva and his family, including the maras' repeated death threats and attempted extortion in retaliation for reporting the rape of Ayala Leiva's sister by known gang members to the police. On remand, should the BIA reach the question of whether Ayala Leiva has shown past persecution or a likelihood of future persecution, it should consider Ayala Leiva's specific claims and the specific evidence that supports those claims.

6

945 F.3d 772, 786 (3d Cir. 2019) (internal quotation marks and citation omitted). Here, the agency erred regarding both prongs.

As to the first prong, the agency failed to acknowledge credible and corroborated evidence that was favorable to Ayala Leiva in evaluating whether he is likely to face torture in the future. See Kang v. Att'y Gen. of U.S., 611 F.3d 157, 164 (3d Cir. 2010) ("The BIA may not ignore evidence in the record that favors the petitioner."); Chavarria, 446 F.3d at 517–18 (noting that the agency's findings are not supported by substantial evidence where it mischaracterizes or understates record evidence). The BIA merely stated that Ayala Leiva "did not submit evidence that he was tortured in the past." BIA Op. at 3. This bare statement ignores the record evidence that, as a young child, gang members pointed a gun to Ayala Leiva's head and threatened to kill him if he did not leave the scene of his sister's rape. The BIA also failed to acknowledge the evidence that gang members sent Ayala Leiva's family repeated death threats until they fled El Salvador. The IJ offered little more, concluding that "nothing in the record indicates that [the] respondent suffered severe physical or mental pain or suffering under the rigorous Auguste standard." IJ Op. at 11 (citing Auguste v. Ridge, 395 F.3d 123 (3d Cir. 2005)).

The agency's failure to consider these relevant facts prevented it from making the requisite legal determination as to whether Ayala Leiva is likely to be tortured upon removal to El Salvador. See Myrie v. Att'y Gen. U.S., 855 F.3d 509, 516 (3d Cir. 2017); see also Kang, 611 F.3d at 164 (explaining that whether the legal definition of torture has been satisfied is a question of law that the BIA must review de novo). Thus, we will remand for the BIA to address Ayala Leiva's evidence as to that issue.

7

The agency's analysis of the second prong was also flawed: it failed to consider all the relevant evidence. This prong asks "how public officials will likely act in response to the harm the petitioner fears" and "whether the likely response from public officials qualifies as acquiescence." *Myrie*, 855 F.3d at 516.

The BIA found it improbable that the Salvadorian government would acquiesce in torture because it is "actively attempting to combat" the gangs. But the BIA did not consider countervailing evidence. BIA Op. at 3. Thus, it did not acknowledge that the police had previously failed to stop the gang harassing Ayala Leiva's family. When the family reported the gang members' attack on Ayala's sister to the police, the police did not protect them. Instead, the gang retaliated with death threats and extortion attempts. Plus, the agency failed to acknowledge Ayala Leiva's testimony that the police normally "don't do anything" to prevent gang violence. A.R. 114−15.

This evidence is relevant to acquiescence. As we said in *Quinteros*, one factor in the analysis is whether the government is "capable of preventing … harm" to its citizens. 945 F.3d at 788. Although this is "not dispositive of whether a government acquiesced in torture," it is relevant. *Id.* (citation omitted). So the agency should have considered whether El Salvador's previous failure to protect Ayala Leiva indicates that it would fail again if he returned. We will remand to let it analyze all the facts.

For these reasons, we will grant Ayala Leiva's petition for review, vacate the BIA's decision, and remand the matter for further proceedings in accordance with this opinion.